**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

PAUL A. VENTICINQUE,               )
                                   )
          Plaintiff,               )
                                   )        No. 21 C 3084
     v.                            )
                                   )        Judge Sara L. Ellis
CITY OF CHICAGO,                   )
                                   )
          Defendant.               )

## OPINION AND ORDER

After Defendant City of Chicago (the "City") terminated Plaintiff Paul Venticinque's employment, he filed this lawsuit alleging that the City retaliated against him in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* (Count I); discriminated and retaliated against him in violation of the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. §§ 4301 to 4333 (Count II); and committed intentional infliction of emotional distress ("IIED") in violation of Illinois law (Count III). Now, the City moves for summary judgment on all claims against it.

The Court grants in part and denies in part the City's motion for summary judgment. Because Venticinque has sufficiently established that issues of material fact exist as to his ADA retaliation and USERRA claims, the Court denies summary judgment on those claims. Because Venticinque failed to show that issues of material fact exist as to his IIED claim, the Court grants summary judgment to the City on that claim.

# BACKGROUND

## I.  Both Parties' Objections and Arguments Concerning their Statements of Facts

To begin, both parties raise objections and arguments challenging each other's statements of facts.  Venticinque objects to many of the City's statements as violating Local Rule 56.1's conciseness requirement.  The City objects to many of Venticinque's responsive statements and statements of additional facts as improperly including legal argument, relying on inadmissible hearsay, denying the contents of authenticated documents, lacking citations to the record, or citing materials in the record that do not support the assertion.

Local Rule 56.1 governs motions for summary judgment and requires that each statement of material facts and statement of additional facts consist of "concise numbered paragraphs." *See* N.D. Ill. LR 56.1(d)(1).  "Each asserted fact must be supported by citation to the specific evidentiary material, including the specific page number.  The Court may disregard any asserted fact that is not supported with such a citation."  N.D. Ill. LR 56.1(d)(2); *see also Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 771 (N.D. Ill. 2012) ("Where a party offers a legal conclusion or statement of fact without proper evidentiary support, the Court will not consider that statement.").  Further, legal arguments in statements of fact are improper, and so the Court will not consider such arguments.  *See Fetzer v. Wal-Mart Stores, Inc.*, No. 13 C 9312, 2016 WL 792296, at *8 (N.D. Ill. Mar. 1, 2016) ("[L]egal arguments in Rule 56.1 submissions are improper so the court will disregard legal arguments and conclusions in the plaintiff's Rule 56.1 submissions.").

The Court finds that the City's factual statements generally adhere to the requirements of Local Rule 56.1.  While Local Rule 56.1 requires conciseness, "[a] statement of material facts that presents one fact at a time per paragraph would not be an efficient manner in which to

present a statement of material facts and would not be consistent with Local Rule 56.1." *Nettles-Bey v. Burke*, No. 11 C 8022, 2015 WL 4638068, at *5 (N.D. Ill. Aug. 4, 2015) (quoting *Fishering v. City of Chicago*, No. 07 C 6640, 2009 WL 395462, at *2 (N.D. Ill. Feb. 18, 2009)). The City's statements of fact are generally short, and statements contained in the same numbered paragraphs are closely interrelated. *See Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1018 (N.D. Ill. 2018) ("Generally, when the presentation becomes more confusing than efficient, as when the facts in a single paragraph are jumbled or disjoined, appear to be non sequiturs, or their connection must be explained by an improper argument, Local Rule 56.1 requires the paragraph to be split." (citing *Nettles-Bey*, 2015 WL 4638068, at *5)). The paragraphs that contain multiple facts are not "more confusing than efficient" and do not make it difficult for "opposing counsel and the court to assess" the individual statements in each paragraph. *Id.* (citations omitted). Therefore, the Court does not find the City's inclusion of multiple facts in certain paragraphs of its statement of facts improper.

The Court agrees with the City that Venticinque has not complied with the requirements of Local Rule 56.1, however. Venticinque repeatedly includes improper legal arguments, statements without support from a citation to the record, and citations to materials that do not support the facts Venticinque asserts. For example, the first paragraph of Venticinque's statement of additional facts states:

> The Plaintiff, Paul Venticinque is an honorably discharged veteran of the U.S. Army that began the Chicago Department of Aviation training academy as a probationary Aviation Security Officer ("ASO") on June 28, 2010. Plaintiff was run out of the training academy because he injured his shoulder on July 2, 2010 during a physical drill at the academy. On July 14, 2010, while unable to physically participate in training, the Department alleged that Plaintiff got into a verbal altercation with one of his fellow recruits; and, two days later, on July 16, 2010 the Department terminated him for the alleged verbal altercation. The other recruit

3

> allegedly called Plaintiff out for what the recruit believes was
> Plaintiff malingering because he was not participating in the
> physical drills, even though that was at the direction of the
> Department. Yet, the other recruit was not disciplined, and
> Plaintiff was terminated.

Doc. 87 at 51–52. This paragraph is devoid of any citation to the record and portions of it amount to legal conclusions. Many of Venticinque's other factual assertions are similarly unsupported and conclusory. Further, even when Venticinque's factual assertions contain citations to the record, the referenced materials in the record sometimes do not support the factual assertion or directly contradict the factual assertion. *See, e.g.*, *id.* at 55 (attempting to support the assertion that Sergeant Yvette Yanez "could not offer any reasons why she received Venticinque's injury report" with a citation to Yanez's deposition transcript wherein she explained that it was standard practice for her unit to receive a copy of every injury on duty report).

Next, the City challenges Venticinque's arguments in his response to the statement of facts that he was living with his father at this time, and that Venticinque provided his father's address to the Chicago Department of Aviation ("CDA"). Venticinque alleges that Yanez told him that he could not report for his onboarding until he received a letter from the City, which Venticinque then alleges that he never received. In support of these assertions, Venticinque cites only to his father's deposition in this case. In relevant part, Venticinque's father testified that:

> All I can tell you is that I got a call from [Venticinque's] previous
> lawyer telling me that he had to report to the class. In the
> Department of Aviation, he was supposed to report to them, and he
> had to get there right away, because he had to start the academy on
> that particular day. But what I was informed by him is that he was
> not to report to any academy or training unless he was notified by
> the City. And then some Sergeant Yanez or something like that
> told him you cannot report until you get the letter from the City.
> He never received the letter. And then all I got was a phone call –
> because he doesn't have a phone – from his previous attorney that

4

told him he had to be in the academy ASAP, and he was never –
never informed about the academy.

Doc. 91-10 at 12.

This testimony contains multiple levels of hearsay and is not admissible. *See Prude v. Meli*, 76 F.4th 648, 661 (7th Cir. 2023) ("To be considered on summary judgment, evidence must be admissible at trial . . . . If the evidence is inadmissible hearsay, the courts may not consider it."). Venticinque's father's testimony seemingly describes a conversation that Venticinque's father had with Venticinque's attorney and a conversation that Venticinque's father had with Venticinque about a conversation that Venticinque had with Yanez. Venticinque attempts to use this testimony for the truth of the matter asserted therein, namely that Yanez told Venticinque he was not to report for training until he received a letter, and that Venticinque did not in fact receive that letter. *See* Fed. R. Evid. 801(c). Even if Yanez's statements to Venticinque were admissible hearsay as an opposing party's admission, no exception permits the admission of Venticinque telling his father about his conversation with Yanez. *See* Fed. R. Evid. 803. Further, the cited statement does not support, even if admitted, that Venticinque provided his father's address to CDA. Because Venticinque did not support his factual assertion that Yanez told him not to report until he received a letter and that he provided his address to CDA with admissible evidence, the Court disregards Venticinque's assertion.[1] *See McCoy v. Wexford Health Sources, Inc.*, No. 12 CV 5467, 2018 WL 4563076, at *3 (N.D. Ill. Sept. 24, 2018)

---

[1] Venticinque also asserts that he received a letter from the City, sent by CDA Commissioner Jamie Rhee, telling him to report to training on December 4, 2018. In support of this assertion, Venticinque cites to Rhee's deposition testimony where Venticinque's counsel showed Rhee a letter, which she did not recognize and did not sign, but which Rhee identified as signed by her co-worker Rich Butler, that congratulated Paul Venticinque and told him to report to training on December 4, 2018. Rhee did not have personal knowledge of whether any City employee ever sent the letter to Venticinque, however. Based on this testimony, Venticinque has not submitted adequate information to support that Rhee mailed him a letter that stated he should report to training on December 4, 2018.

("[T]he Court does not consider an asserted fact that is not supported by admissible evidence, or an asserted fact that is not supported by the cited evidence.").

The City also challenges Venticinque's use of his own deposition testimony regarding a conversation he had with Department of Aviation Sergeant Frego. In his deposition for this case, Venticinque stated that during the rehiring process, Frego came up to him and said that "upper management" knew the circumstances surrounding his rehire and "they're going to do whatever they can to stop you from getting to graduation." Doc. 91-9 at 210–13, 266–67. Venticinque offers Frego's out of court statement for the truth of the matter asserted therein, namely that upper management planned to ensure he never graduated from training, which renders the statement hearsay. *See* Fed. R. Evid. 801(c). However, a statement is not hearsay when it is "offered against an opposing party" and "was made by a person whom the party authorized to make a statement on the subject" or "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2). The City argues that the statement is not admissible as an opposing party admission because there is no evidence that Frego[2] was acting as the City's agent, that he was acting within the scope of his employment when he made the hearsay statement, or that Frego held sufficient rank to bind the City with his statements.

The Court agrees with the City and finds that it does not have sufficient evidence to infer that Frego acted within the scope of his employment when he made the alleged statement to Venticinque. Venticinque's testimony supports that Frego made the statement to Venticinque on the second day he reported about human resources ("HR") matters, and that Frego made the

---

[2] The City refers to Frego as "Frigo." Doc. 108 at 19. The Court understands that when Venticinque refers to "Frego" he is referring to the same person that the City refers to as "Frigo." The dispute over the spelling of the name is not material, and for the sake of clarity the Court will refer to the individual as "Frego."

statement to Venticinque when they "crossed paths" and Frego "came up to" Venticinque. Doc. 91-9 at 210–13. But beyond that, Venticinque's testimony does not establish what Frego was doing at the location to which Venticinque reported for his HR matter or whether Frego had any responsibilities at all related to Venticinque's employment. Courts have previously found that a "subordinate's . . . account of an explanation of the supervisor's . . . understanding regarding the criteria utilized by management in making decisions on hiring, firing, compensation, and the like is admissible against the employer, regardless of whether the declarant has any involvement in the challenged employment action." *Baines v. Walgreen Co.*, 863 F.3d 656, 663 (7th Cir. 2017) (quoting *Simple v. Walgreen Co.*, 511 F.3d 668, 672 (7th Cir. 2007)). Still, "for an employee's statements to be admissible when the employee hasn't been personally involved in the disputed employment action, the employee's duties must encompass some responsibility related to decision-making process[es] affecting the employment action." *EEOC v. Staffmark Inv. LLC*, 67 F. Supp. 3d 885, 891 (N.D. Ill. 2014) (citing *Makowski v. SmithAmundsen*, 662 F.3d 818, 822–23 (7th Cir. 2011)). Here, because Venticinque has not submitted any evidence to support that Frego in any way possessed any responsibility related to his employment, Venticinque fails to show that Frego's statements are an opposing party admission, and so the statements are not admissible.

In summary, the Court reviewed all of the evidence presented by both parties and both parties' statements of facts. The Court will only consider those facts that the parties properly present without legal argument and support with admissible evidence. *See Sanders v. Fredricks*, No. 10 C 5714, 2016 WL 8711472, at *2 (N.D. Ill. Jan. 8, 2016) (finding that where a party's factual assertions sometimes contained admissible content and other times contained unsupported assertions or improper legal conclusions, the Court should only consider those

portions of the asserted facts that were "properly presented and supported by admissible evidence"). The Court provides additional explanations for some of the challenged statements it finds appropriate to consider in the next section. The Court admonishes Venticinque for failing to properly follow the Rule 56.1 process.

## II.     Factual Background

### A.     Venticinque's Initial Term as a Probationary ASO and Discrimination Claim

Venticinque is an Army veteran. The Army honorably discharged Venticinque in 2005 due to his medical condition, vertigo.

The CDA hired Venticinque as a probationary Aviation Security Officer ("ASO") on June 28, 2010. ASOs work in the Safety and Security Section of the CDA, which is responsible for security operations at Chicago airports. Like the other newly hired probationary ASOs, Venticinque started the recruit training program at the Cook County Sheriff's Police Training Academy. In early July 2010[3], while in training, Venticinque reported to his trainers that he injured his shoulder and could not continue with the training. Additionally, on July 14, 2010, Venticinque got into an argument with a fellow recruit regarding Venticinque's failure to participate in training. On July 16, 2010, CDA terminated Venticinque's employment as an ASO.

On July 26, 2010, Venticinque filed a charge of discrimination with the Illinois Department of Human Rights ("IDHR"), alleging that CDA terminated him based on his disability and veteran status. The IDHR issued a Notice of Substantial Evidence to Venticinque on August 15, 2011.

---

[3] A dispute of fact exists as to when Venticinque injured his shoulder during training or whether, in fact, he injured his shoulder at all. Venticinque argues he injured his shoulder in training on July 2, 2010, and the City argues that Venticinque alleged that he injured his shoulder on July 7, 2010. The Court finds that this dispute is not material, as the parties do not dispute the fact that Venticinque reported to his trainers that he injured his shoulder in training in early July 2010, before the City terminated Venticinque.

Venticinque also filed a complaint with the Illinois Human Rights Commission ("IHRC") on July 29, 2011. Following an IHRC hearing on February 8 and 9, 2017, an Administrative Law Judge found that:

> Respondent has admitted that Complainant's veteran status was a factor in its decision to discharge him. In addition, Complainant proved by a preponderance of the evidence that Respondent perceived him to have a physical disability and that it took that perception into account when deciding to discharge him. Moreover, Complainant proved by a preponderance of the evidence that Respondent's articulated reason for his discharge was a pretext for unlawful discrimination. Accordingly, it is recommended that the second amended complaint in this matter be sustained in its entirety and that Complainant be awarded the following relief: [list of relief].

Doc. 78-5 at 83–84. The Administrative Law Judge's recommendation became a final order on November 7, 2018.

Pursuant to that order, the IHRC ordered CDA to rehire Venticinque as a probationary ASO and assign him to the training academy to obtain the training necessary to perform the duties of an ASO. Additionally, the IHRC ordered that once Venticinque successfully completed the training, the CDA provide Venticinque with an ASO position with benefits, more than $250,000 in backpay, and the seniority Venticinque would have earned if CDA had not discharged him in 2010. Based on the language of the IHRC's order, Venticinque's entitlement to his backpay and ASO position were contingent upon him "successfully complet[ing] his training." Doc. 78-5 at 84.

Following the IHRC's order, the parties jointly submitted a report to the IHRC on ASO qualifications and training, which stated that the "major components" of the training to become an ASO were six weeks of classroom training, three weeks of on-the-job training, and three weeks of training "on the Watch of assignment." Doc. 78-2 at 104. More specifically, the training included forty hours of airfield driving.

9

In his deposition testimony for this case, former CDA Managing Deputy Commissioner for Safety and Security, Andrew Velasquez, testified that he believed training to be an ASO in 2017 or 2018 involved four to six weeks of training. He also stated that this number of weeks was based on his memory, and that he could be off.

## B.  Venticinque's Rehiring and Training as a Probationary ASO

Following the IHRC's order, the parties began the process to rehire and train Venticinque. In 2018, Venticinque did not have an email account or cell phone. CDA attempted to contact Venticinque regarding his onboarding through emails to Venticinque's sister and legal counsel. CDA requested Venticinque's phone number and address from his sister on November 8, 2018. Yanez, the City employee who requested the address and phone number from Venticinque's sister, testified that she never received his address.

Twice in November 2018, Venticinque's sister responded to emails from the City, stating that she would pass on information from the City to Venticinque or providing information from Venticinque to the City. For example, on November 12, 2018, in response to an email from Yanez requesting that Venticinque report to a certain address to complete paperwork and bring his social security card, Venticinque's sister emailed that "Paul does not have his social security card. . . . He will bring his military ID which has his social security number on it." Doc. 78-3 at 181.

Venticinque testified at his deposition that when he showed up to complete his new hire paperwork, one of the employees there greeted him by name even though she did not know him, and the employees did not have his onboarding paperwork even though they had it for the other recruits.

10

On November 21, 2018, at approximately 9:00 a.m., Venticinque's counsel emailed Heather Becker, counsel for the City in Venticinque's original lawsuit, raising concerns with how the City was treating Venticinque during the onboarding process and asking Becker to pass on the concerns to the City.[4]  Doc. 78-6, at 8.  Specifically, Venticinque's counsel stated that when Venticinque reported to complete his on-boarding paperwork, employees were rude to Venticinque, and they did not have the paperwork for him to complete.  *Id.*  Further, despite showing up to complete his drug test and physical, City employees cancelled and rescheduled Venticinque's appointment.

Also, on November 21, 2018, at approximately 10:00 a.m., City employees Argentene Hrysikos, the CDA Director of Administration; Arthur Everett, the CDA Deputy Commissioner of Aviation Security; and Andrew Velasquez, the CDA Managing Deputy Commissioner of the Safety and Security Division emailed among themselves with the subject "FW: Paul Venticinque v. City of Chicago."  Doc. 91-4 at 130.  Hrysikos stated "[p]lease see email below.  Can someone clarify what happened regarding Mr. Venticinque."[5]  *Id.*  Velasquez responded the same day, stating that "[w]e are researching this now and will send an email shortly."  *Id.*  Further, in the email chain, Everett asks Yanez, "I understand you spoke with Andrew on this.  What's the status?"  *Id.*  The email chain attached contains no response.

The parties dispute whether the City informed Venticinque of the start date for his ASO training.  The City argues that it informed Venticinque by both email and physical mail to report for the CDA training program on December 3, 2018.  In support of this factual assertion, the City references a letter addressed to Venticinque that it maintained in the ordinary course of business

---

[4] The email is rife with hearsay, but neither party attempts to use it for the truth of the matters asserted therein, rather the City uses the email as evidence that it communicated with Venticinque through his counsel and that it received the concerns from Venticinque on November 21, 2018.

[5] The parties did not provide the forwarded email to this Court.

and Venticinque's deposition testimony that he returned to the academy for training on December 4, 2018. The City also references an email it sent to Venticinque's counsel, which stated that "December 3 is the actual start date for ASOs, provided all of the City requirements have been satisfied." Doc. 78-6 at 10. To refute the City's claim that it sent Venticinque the start date, Venticinque points to his sister's deposition testimony. Venticinque references his sister's statements that: "I had no notice [of the first day of training], and [Venticinque] didn't either" and, reading from an email Venticinque's sister sent to Yanez on December 2, 2018, "Paul was told that the start date of the training program was December 3rd, yet has not been notified if it is cancelled or still on the day before."[6] Doc. 91-8 at 25, 42. When asked further about the December 2, 2018, email in her deposition, Venticinque's sister did not recall whether Venticinque had dictated the email to her or how she came to know that Venticinque learned of the December 3 training date.

After Venticinque's sister emailed Yanez on December 2, 2018, inquiring about Venticinque's start date, Yanez forwarded the email to City employees Phyllinis Easter, Everett, and Velasquez with the note "[p]er our discussion see below email" at approximately 10:00 p.m. on the same day. Doc. 91-4 at 132. One minute later, Velasquez emailed Yanez, asking her to call him. In her deposition for this case, Yanez stated that she believes she called Velasquez after she received his email, but she does not recall anything about their discussion. Velasquez stated that he could not remember if Yanez called him or what they would have spoken about.

---

[6] The City attached the email that Venticinque's sister sent Yanez on December 2, 2018, in its entirety. *See* Doc. 78-6 at 15.

### C.      Venticinque's Training

Ultimately, Venticinque did not attend the first day of his scheduled training on December 3, 2018.  Venticinque attended the next day, December 4.  Venticinque's supervisors did not reprimand or discipline him for his absence on the first day.

On December 7, 2018, Venticinque and another recruit were unable to obtain their badges during training.  CDA uses badges as both identification and as a means to control access to certain systems.  The City presented a memorandum written by Lt. Akram titled "ID Badging Issue," which stated that on December 7, 2018, Akram could not issue badges to Venticinque and another recruit because they did not possess two forms of identification.  Akram wrote that he consulted with the Assistant to the Commissioner, Orlando Medina, about whether he could process the recruits without two forms of identification.  According to Akram, Medina asked both recruits to wait outside of his office and then Medina told Akram that the recruits could not be issued an ID without two forms of identification because of Transportation Security Administration requirements.  Venticinque testified in his deposition that when he reported to the badging office, Medina, who had been involved in Venticinque's previous lawsuit against the City, recognized Venticinque and told Venticinque to get out of his office.[7]  Venticinque also testified that he showed up for badging with his driver's license and birth certificate.  The City later issued Venticinque his badge on January 10, 2019.  Other probationary ASOs in the training received their badges before and after Venticinque received his badge.  Venticinque testified that his trainers rode him for not having a badge.

On December 10, 2018, Venticinque and another recruit got into an argument. Venticinque asked the other recruit for a sheet of paper, and the other recruit told Venticinque he

---

[7] Venticinque's testimony about what Medina said to him is admissible as an opposing party's statement because the City does not dispute that Medina was a City employee responsible for issuing badges.  *See* Fed. R. Evid. 801(d)(2).

could get his own paper at a dollar store. Venticinque then told the recruit not to ask him for anything again because Venticinque previously gave the other recruit money for a cup of coffee. Venticinque documented his argument with the other recruit in a written statement, which Venticinque acknowledged in his deposition was accurate. Venticinque stated that his disagreement with the other recruit was not a heated exchange.

Although ASOs are generally issued bullet-proof vests, the City did not issue one to Venticinque. Venticinque testified that when an employee sized the other recruits for their bullet-proof vests, that employee told him that he was not on the list to receive a vest. Venticinque testified that because he did not have a bullet-proof vest, he was not able to complete assignments he needed to graduate training and that he could not work at checkpoints. The CDA Shift Supervisor of Aviation Security submitted a declaration stating that probationary ASOs do not always receive their bullet-proof vests at the same time due to shipping issues, the CDA does not enforce any requirements that ASOs wear bullet-proof vests while on duty, and that Venticinque's training was not delayed because he did not receive a bullet-proof vest.

On January 18, 2019, Venticinque passed the classroom portion of the ASO training program.

### D. Venticinque's 2019 Ear Injury

Venticinque then began his on-the-job training and cycled through spending one week on each watch from January 20 to February 9, 2019. Following those rotations, the City assigned Venticinque to First Watch from February 10 to March 16, 2019. Venticinque testified that he was the only recruit to have his shift and work assignment changed numerous times. Further, Venticinque testified that while the City denied his requests to work certain assignments, it granted the requests of some of his fellow recruits.

14

Venticinque testified that the City assigned him to work with a series of questionable people, including a person with mental health issues, a person who tested positive for drugs, and a person who would watch pornography while on duty. On February 14, 2019, after Venticinque reported that he was "doing all the work" when assigned to work with a different ASO, a City employee, Mills, reassigned Venticinque. Doc. 78-2 at 158. On an unspecified date, Venticinque reported an ASO for watching pornography while on duty and "requested to come back to the station to be reassigned." Doc. 91-9 at 326–28.

Venticinque also testified that after he received his driving privileges, his supervisors assigned him to drive the perimeter of an airport every day for weeks. Venticinque explained that this was not a desirable assignment because such driving was dangerous and could lead to serious discipline. Specifically, if the vehicle Venticinque drove set off a sensor, he believed the City would fine or terminate him. Patrolling the airport is an essential duty of an ASO, however. Venticinque acknowledged in his deposition that the City required new recruits to spend a certain amount of time driving the perimeter but stressed that he believed the City assigned him to such driving unusually frequently. The City never disciplined Venticinque for any driving infractions.

Another responsibility of an ASO is to manually inspect the automated external defibrillators ("AEDs") located around the airport terminals. Once a week, an ASO manually inspects each AED. As part of manually inspecting each AED, the ASO sets off the AED's alarm to confirm both the sound of the alarm and that CDA's command center receives the alarm.[8] Then, once the ASO confirms with the CDA command centers that it received the alarm

---

[8] Venticinque challenges this information as inadmissible hearsay and lacking foundation. While the City does offer this information from the ASO AED training materials for its truth, the City has submitted a declaration from Deputy Commissioner Lopez attesting that these training materials were kept by the City in the ordinary course of business. Doc. 78-3 at 1–2. The Court thus finds that these materials fall under a hearsay exception and have adequate foundation. *See* Fed. R. Evid. 803(6).

through a phone contained in the AED cabinet, the ASO resets the AED using an assigned AED key.  Lastly, the ASO seals the AED and confirms that it is armed.  The ASO documents the inspection in a form.

On February 11, 2019, Venticinque worked with ASO Rodriguez during his shift.[9] Together, Venticinque and Rodriguez checked seventeen AEDs in a terminal.  The City submitted a video recording of Venticinque and Rodriguez inspecting the AEDs on February 11, 2019.[10]  The video shows Venticinque and Rodriguez walking around terminals and speaking to one another, although the video contains no audio.  The exact times at which Venticinque and Rodriguez checked each AED in the videos is not clear from the materials submitted.

Rodriguez asserted that he checked the AEDs with Venticinque and that CDA did not permit Venticinque to work alone.  Rodriguez stated that each AED he inspected was in the armed position when he began his inspection, and that he reset each AED into the armed position by the end of his shift.  Further, Rodriguez attested that Venticinque was with him throughout his shift until 5:30 a.m., he completed the inspection form, he did not wear hearing protection, and he was not aware of anyone outside of his presence that night opening any AED cabinets.  According to Rodriguez, at no point during their shift together did Venticinque complain of any injury.  Rodriguez had no knowledge of Venticinque working for CDA prior to him being a

---

[9] Venticinque also seemingly challenges the written declaration of Rodriguez and the deposition testimony of James Wood as inadmissible hearsay and lacking foundation.  The Court has examined both documents and does not identify any out of court statements that the City improperly uses for the truth of the matters asserted therein.  The Court also finds that Rodriguez and Wood do not lack foundation for their testimony or statements because both speak about their personal perception of events.

[10] Venticinque objects to the video recording as inadmissible hearsay that lacks foundation.  The video is not hearsay.  *See Boothe v. Wheeling Police Officer Sherman*, 190 F. Supp. 3d 788, 793 (N.D. Ill. 2016) (accumulating authority to support that video recordings and other electronic data generated by a machine is not hearsay, as it is not a statement made by a person).  Further, the City does not offer any statements made by any individuals in the video for their truth.  Lastly, the City offers adequate authority for the video through Lopez's declaration, in which he attests that the video is a true and accurate copy of the video recording.

probationary ASO in February 2019, he did not know of Venticinque's previous lawsuit against the City, and he did not know that Venticinque had a disability or was a veteran.

In his deposition, Venticinque claimed that he checked some AEDs on his own before meeting with Rodriguez. Venticinque could not recall which specific AEDs he checked on his own, however. Venticinque stated that Rodriguez wore ear protection when they checked AEDs together and Venticinque did not wear ear protection.

Rodriguez attested that he had an AED key on February 11, 2019. Venticinque testified that he did not have an AED key that night.

On February 12, 2019, Venticinque submitted a memorandum to the watch commander, James Woods. The memorandum states that on February 11, 2019, Venticinque was responsible for inspecting every AED in terminal 3, the AEDs emit a loud sound when opened, and that after inspecting the AEDs, Venticinque was experiencing a high pitched ringing in his ears. Venticinque wrote that his ears were still ringing, causing him headaches, and that he felt he needed to see an ear specialist to assess the extent of the damage. Further, Venticinque expressed that he wished that someone would have warned him of the danger of the loud noise from the AED alarms.

Venticinque reported for his shifts on February 13 and 14, 2019. Venticinque called off his February 15, 2019, shift and told Woods that he could not attend the training scheduled for that day because of his injuries.[11] Woods stated that he told Venticinque that in order to go on "duty disability" he had to go see a City doctor and pick up some paperwork. Doc. 78-7 at 79. Woods testified that Venticinque told him that he could not drive because of the damage to his inner ear and that he would have a friend drive him to Woods' office to pick up the paperwork.

---

[11] Venticinque challenges Woods' testimony as hearsay and lacking foundation. The Court finds that Woods' testimony about Venticinque calling him on February 15, 2019, is an opposing party statement and adequate foundation exists for Woods to testify about his personal knowledge of that phone call.

Venticinque testified in his deposition that on some date he could not recall, Woods called and spoke with Venticinque's father, thinking that it was Venticinque. Venticinque stated that Woods told Venticinque's father that Venticinque needed to come in and get paperwork on one of Venticinque's days off. Venticinque noted that Woods had failed to give him the paperwork when he was at work earlier in the week. Venticinque denies telling Woods that he could not drive. Venticinque admits to driving to O'Hare to pick up a packet of paperwork related to his injury. Video provided by the City shows that on February 15, 2019, Venticinque's car parked at O'Hare and Venticinque got out of the driver's side of the vehicle.

Venticinque testified that Woods told him not to return to work until he received clearance from the doctors and to call in to work every time he was supposed to work and state that he was "injured on duty." Doc. 91-9 at 201–202, 231, 244–45, 250.

Beginning on February 15, 2019, Venticinque called off from every shift, stating that he was "injured on duty." Between February 15, 2019, and June 21, 2019, Venticinque missed 105 days of work. Venticinque never returned to work after February 14, 2019.

Venticinque testified that sometime after his ear injury, he spoke with Woods on a phone call, and he told Woods that he was able to return to work. Venticinque believed he was ready to return to work four or five days after his injury. Venticinque testified that Woods kept him from returning to work, and that after the initial phone call, Woods refused to speak with him. Venticinque also stated that he went to Lieutenant Anderson to request to see Commissioner Vasquez in order to request to return to duty, but City employees denied Venticinque's requests to see Vasquez.

Venticinque submitted a CDA document titled "Standard Operating Procedure," which states that its effective date was May 1, 2010, and that its audience is "All CDA Employees,"

18

issued under the authority of the "Department of Human Resources." Doc. 88-7 at 1. In relevant

portion, the document states that:

> Once required documentation from the reporting supervisor is
> received, CDA-HR will review documentation and determine the
> employee's work status.
>
> 1. CDA-HR will initiate workers' compensation claim activities
> with CCMSI, the City's third-party administrator. CCMSI will
> conduct a claim investigation and may contact the employee to
> gather additional information.
>
> 2. CDA-HR will determine whether the employee's work status
> will be updated to duty disability based on the extent of injuries
> and required duration of absence indicated by the MercyWorks
> physician, or opinion provided by 2nd or 3rd provider seen.
> . . .
>     b. If the required duration of absence is four (4)
> consecutive scheduled work days or greater, the employee will be
> placed on duty disability status.

*Id.* at 3–4.

The City attached its collective bargaining agreement ("CBA") with the Public Safety

Employees' Union, which was effective between January 1, 2018, and June 30, 2022. Article 15

of the CBA governs different kinds of paid leave, whereas Article 17 of the CBA governs unpaid

leave. Section 15.4 of the CBA, titled "sick time," provides in relevant part that "All other

employees who are hired after January 1, 2018, or who have not completed one hundred and

eighty (180) days of continuous employment with the Employer as of that date, shall accrue sick

time once they have completed one hundred and eighty (180) days of continuous employment

with the Employer." *Id.* at 55. Section 15.5 of the CBA provides that "Injury on Duty" leave is

available to "Crossing Guard[s]," and Section 15.8 states that for "Duty Disability Leave" "[a]ny

employee who is absent from work due to an injury on duty shall be granted a leave of absence."

*Id.* at 55–56. Separately under Section 17.2, the CBA states regarding "Medical Leave" that

19

"[n]on-probationary employees shall be granted medical leaves of absence upon request . . . for up to three months . . . . The Employer may request satisfactory proof of medical leave of absence." *Id.* at 59.

### E. Venticinque's Worker's Compensation and FMLA Claim

In his deposition, when asked whether he ever submitted a request for a reasonable accommodation related to his hearing, Venticinque stated that he "didn't even know that was an option." Doc. 91-9 at 203. Instead, after his ear injury, Venticinque submitted a worker's compensation claim. The City referred Venticinque's worker's compensation claim to a third-party administrator, Cannon Cochran Management Services, Inc. ("CCMSI"). Venticinque testified at his deposition that he had no knowledge of whether anyone at CCMSI was aware of his previous lawsuit or discrimination claims against the City.

As part of the evaluation of Venticinque's worker's compensation claim, Dr. Nicholas Lygizos examined Venticinque's hearing on March 29, 2019. Dr. Lygizos testified that Venticinque did not inform him of his previous diagnosis of vertigo or his service in the military. Dr. Lygizos stated that "I would say that this [wa]s a case of a patient who I f[ound ]to be malingering," which meant that Venticinque "express[ed] a complaint that [did]n't match the objective evidence." Doc. 78-9 at 57. Specifically, Dr. Lygizos found that the results of Venticinque's tests were inconsistent. But Venticinque testified that two other doctors evaluated him and found that he suffered from bilateral hearing loss. On June 11, 2019, CCMSI denied Venticinque's worker's compensation claim.

On June 10, 2019, Dr. Lygizos signed a "Certification of Health Care Provider for Employee's Serious Health Condition (Family and Medical Leave Act)." Doc. 86-2 at 2, 5. The Family Medical Leave Act ("FMLA") certification concerned Venticinque, with the "date

condition commenced" listed as "February 11, 2019." *Id.* at 3. Dr. Lygizos checked "Yes" after the question "[w]ill the employee be incapacitated for a single continuous period of time due to his/her medical condition, including any time for treatment and recovery?" *Id.* at 4. Dr. Lygizos did not include any written information about Venticinque's condition other than a note of "work-up in progress." *Id.* The FMLA certification also includes a page that is an "Application for Family and Medical Leave or Personal Medical Leave," which Venticinque filled out and signed. *Id.* at 6.

In his deposition, Dr. Lygizos acknowledged that he signed a FMLA form for Venticinque on June 10, 2019, and that he wrote simply "work-up in progress" as the description on the form. Doc. 78-9 at 78.

### F. Venticinque's Second Termination

The City has submitted timekeeping records of Venticinque's time punches from February 2019.[12] The City timekeeping records show that Venticinque punched out of work at 5:54 a.m. on February 4, 2019; 5:53 a.m. on February 6, 2019; 5:53 a.m. on February 7, 2019; 5:54 a.m. on February 8, 2019; 5:56 a.m. on February 11, 2019; 5:54 a.m. on February 13, 2019; and 5:55 a.m. on February 14, 2019. Venticinque testified that his shift was scheduled to end at 6:00 a.m. and that he believed there was an eight- to ten-minute grace period for punching out.

---

[12] Venticinque argues that the timekeeping records are inadmissible hearsay. The Court rejects Venticinque's argument because recordings made by a machine or technology are not statements by a person and are not inadmissible hearsay. *See Boothe,* 190 F. Supp. 3d at 793 (accumulating authority to support that electronic data generated by a machine is not hearsay, as it is not a statement made by a person); Fed. R. Evid. 801(a) (defining "statement" as "a *person's* oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion" (emphasis added)). Further, Everett compiled these timekeeping records as part of a memorandum requesting Venticinque's termination. The City's Deputy Commissioner submitted a declaration stating that the City maintained the memorandum requesting Venticinque's termination and the exhibits attached thereto, including the timekeeping records, in the ordinary course of business.

Probationary ASO training materials from January 2019 state that "[a]ll probationary ASOs are required to be trained on each shift by a supervisor and are not permitted to work any assignment unsupervised/alone."[13] Doc. 78-4 at 110. Venticinque testified that in practice, he and other probationary ASOs regularly worked alone on certain days or at certain assignments. Venticinque could not recall any specific nights that he worked alone, but he stated that generally when working terminals, probationary ASOs would work alone.

The City submitted a memorandum written by Sergeant Zaleski and dated February 2, 2019, titled "Probationary ASO Paul Venticinque not following the assigned schedule on January 22, 2019."[14] Doc. 78 at 129. Zaleski states in the memorandum that on January 22, 2019, he observed Venticinque leave his assigned post before the scheduled time and that Zaleski questioned him about leaving. In response, Venticinque told Zaleski that he left his post because the officer that worked the post told him to. Zaleski then advised Venticinque to adhere to his assigned schedule.

The City also submitted a memorandum written by "Officer Watt" dated February 27, 2019. The memorandum states that Watt and Venticinque worked together on February 5, 2019. However, Watt states that after he met back up with Venticinque following their break, Venticinque did not go on the second round of door checks with Watt and Watt did not see Venticinque again for the remainder of the shift. Echevarria Giorimar similarly wrote a memorandum on February 23, 2019, attesting that on February 8, 2019, Venticinque did not stay

---

[13] The Court finds that the training materials are admissible and supported by adequate foundation, because the City maintained the training materials in the ordinary course of business and they were created by an Assistant Commissioner around the time of Venticinque's training.

[14] The memorandum is part of the exhibits attached to the memorandum requesting Venticinque's termination, and the Court finds that the memorandum is not inadmissible hearsay because Zaleski created the memorandum in the ordinary course of business and the alleged statements from Venticinque that it contains are opposing party statements. *See* Fed. R. Evid. 801(d)(2), 803(6).

with Giorimar for the entirety of his shift. "Officer Rodriguez" wrote a memorandum on February 24, 2019, stating that on February 11, 2019, Venticinque left his post at 5:30 a.m. because Venticinque went to go punch out in a different building, claiming that his ID card did not function at the timekeeping device at their post.[15] *Id.* at 143.

On June 21, 2019, Everett sent a memorandum to Rhee titled "Probationary ASO Paul Venticinque Request for Separation." *Id.* at 116. Everett recommended the termination of Venticinque for "numerous infractions" including swiping out early, abandoning his post, arguing with a fellow recruit during training, Venticinque's injury on duty claim not being substantiated by the video footage, and Venticinque's related worker's compensation claim being denied. *Id.* at 116–21. At the time he prepared the memorandum, Everett knew that Venticinque had won a lawsuit against the City and that the City would be required to pay Venticinque a sum of money upon his completion of ASO training.

On June 25, 2019, Rhee approved Venticinque's termination and the City terminated Venticinque from his position.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To determine whether a genuine dispute of material fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, documents, answers to interrogatories, admissions, stipulations, and affidavits or declarations that are part of the record. Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992).

---

[15] The Court finds that the memorandums by Watt, Giorimar, and Rodriguez are admissible and based upon adequate foundation. The officers wrote about their personal perceptions, the memorandums were prepared and maintained in the ordinary course of the City's business, and any statements attributed to Venticinque in the memorandums are opposing party statements.

The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). The Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 842 (7th Cir. 2013). However, a bare contention by the non-moving party that an issue of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture,'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted).

## ANALYSIS

### I. ADA Retaliation Claim

First, the City moves for summary judgment on Venticinque's ADA retaliation claim. "To defeat summary judgment on a claim of retaliation under the ADA, a plaintiff must show: (1) statutorily protected activity; (2) an adverse employment action; and (3) a causal connection between the protected activity and the adverse action." *Bruno v. Wells-Armstrong*, 93 F.4th 1049, 1055 (7th Cir. 2024) (citing *Trahanas v. Nw. Univ.*, 64 F.4th 842, 856 (7th Cir. 2023)).

#### A. Protected Activity

For Venticinque to have engaged in protected activity under the ADA, he "must have asserted [his] rights under the ADA by either seeking an accommodation or raising a claim of

discrimination due to [his] disability." *Trahanas*, 64 F.4th at 856 n.6 (quoting *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 814–15 (7th Cir. 2015)). Venticinque alleges that he engaged in the following protected activities: (1) his 2011 IDHR complaint and IHRC lawsuit for his shoulder injury; (2) his FMLA application; (3) his worker's compensation claim; and (4) reporting his ear injury in February 2019.

The City concedes that Venticinque's "IDHR charges and IHRC complaint raised a claim of disability discrimination, and therefore constitute protected activity under the ADA." Doc. 77 at 8. However, the City argues that only the filing of the IDHR charge and IHRC complaint constitutes the protected activity, not the IHRC ruling in favor of Venticinque that followed. It appears that the City argues that the Court should not consider the fact that Venticinque stood to gain more than $250,000 in backpay from his previous disability discrimination lawsuit against the City for completion of his training as an ASO, or that the City terminated Venticinque before he completed that training or received the backpay.

The Court finds that the City's argument raises a distinction that does not make a material difference for purposes of finding that Venticinque engaged in protected activity. The City concedes that Venticinque's IDHR charges and IHRC complaint amount to protected activity. Whether the ruling in favor of Venticinque and Venticinque's subsequent termination amounts to suspicious timing goes to showing a causal connection between an adverse employment action and the protected activity. *See Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 787 (7th Cir. 2007) (considering an argument about the timing of adverse employment actions as a causal connection issue, not a protected activity issue). The Court will discuss the timing issue further in that section.

Next, the City argues that Venticinque's FMLA application does not qualify as protected activity under the ADA because the FMLA application arises from a different statutory scheme and Venticinque did not submit adequate evidence to show he submitted a complete FMLA application or that any CDA supervisor knew of such an application. The Seventh Circuit has assumed without deciding that an FMLA leave constitutes a statutorily protected activity under the ADA. *See Trahanas*, 64 F.4th at 856; *Freelain v. Vill. of Oak Park*, 888 F.3d 895, 901 (7th Cir. 2018). Some other circuit courts and courts in this district have found that FMLA leave is not a protected activity under the ADA, however. *See Durns v. Fam. Guidance Ctrs., Inc.*, No. 19 C 4154, 2021 WL 4477919, at *11 n.8 (N.D. Ill. Sept. 29, 2021) (accumulating authority). The Court does not need to decide the issue in this case, as discussed in the causation section below.

The City also argues that Venticinque's worker's compensation claim is not a protected activity. The Court agrees with the City, as courts have repeatedly found that "[f]iling a worker's compensation claim is not recognized as a statutorily-protected activity under the ADA." *See, e.g.*, *Williams v. Chi. Trans. Auth.*, No. 24 CV 1874, 2024 WL 3455022, at *5 (N.D. Ill. July 18, 2024) (citing *Corrales v. Westin Hotel Mgmt. LP*, No. 17 C 6868, 2019 WL 1762907, at *8 (N.D. Ill. Apr. 22, 2019)).

Finally, Venticinque argues that, although he did not submit a written request for a reasonable accommodation, he reported his injury on February 12, 2019, and, in response, the City placed him on unpaid leave, refused to provide him with paperwork for an accommodation, prevented him from returning to work, and did not engage in an interactive process with him to provide him with a reasonable accommodation. The City argues that Venticinque's conduct was not protected activity due to his failure to request a reasonable accommodation and that

26

Venticinque has not presented admissible evidence that he was placed on unpaid leave, the City did not provide him with paperwork to request a reasonable accommodation, or that he was blocked from returning to work.

The Court finds that Venticinque has not adequately raised an issue of material fact as to whether he requested an accommodation or the City refused to engage in an interactive process with him regarding a reasonable accommodation. In response to a question about whether he ever submitted a request for a reasonable accommodation related to his hearing, Venticinque stated that he "didn't even know that was an option." Doc. 91-9 at 203. On February 12, 2019, Venticinque submitted a memorandum to his watch commander, Woods, stating that he was experiencing a high pitched ringing in his ears after inspecting the AEDs, felt that he needed to see an ear specialist to assess the damage to his ears, and expressed that someone should have informed him of the risk of injury to his ears from the AED alarms. Venticinque attended work on February 13 and 14, 2019, and then began calling off from work due to his injury on February 15, 2019. Venticinque testified that Woods told him not to return to work until he received clearance from the doctors, to call in as injured each day, and that when he told Woods that he was able to return to work, Woods prevented him from returning. He also stated in his deposition that after his phone call with Woods where he told Woods that he could return to work, Woods refused to speak with him.

Generally, "unless there are 'special circumstances, like a severe cognitive disability or mental illness,' the reasonable accommodation process begins with the employee, who has the 'initial duty' to 'indicate to the employer that [he] has a disability *and* desires an accommodation." *Jones v. Ill. Dep't of Corr.*, No. 18 C 2045, 2020 WL 3050324, at *4 (N.D. Ill. June 8, 2020) (quoting *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1178 (7th Cir. 2005),

*overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 843 F.3d 760, 765 (7th Cir. 2016)).

Then, that request from the employee "triggers an 'interactive process' between the employer

and employee 'to determine the extent of the disability and what accommodations are

appropriate and available.'" *O'Toole v. Acosta*, No. 14 C 2467, 2018 WL 1469045, at *12 (N.D.

Ill. Mar. 26, 2018) (quoting *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 804 (7th Cir.

2005)). Courts apply these general rules with "flexibility" when assessing the initiation of the

interactive process:

> No hard and fast rule will suffice, because neither party should be
> able to cause a breakdown in the process for the purpose of either
> avoiding or inflicting liability. Rather, courts should look for signs
> of failure to participate in good faith or failure by one of the parties
> to make reasonable efforts to help the other party determine what
> specific accommodations are necessary. A party that obstructs or
> delays the interactive process is not acting in good faith. A party
> that fails to communicate, by way of initiation or response, may
> also be acting in bad faith. In essence, courts should attempt to
> isolate the cause of the breakdown and then assign responsibility.

*Id.* (quoting *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996)).

Taking the evidence in the light most favorable to Venticinque, a reasonable jury could

find that Venticinque's memorandum to Woods on February 12, 2019, and Venticinque's

testimony about his phone call to Woods support that Venticinque informed Woods of his

disability. There is no evidence suggesting that Venticinque expressed to Woods that he wanted

an accommodation to continue his work, however. Rather, at most, Venticinque established that

at one point in communicating with Woods, he expressed that he could not work due to his

injury, and at a different point he expressed that he could return to work. None of Venticinque's

alleged statements are a request for an accommodation, and Venticinque's deposition testimony

supports that he did not make any such request. *See id.* at *13 ("[H]is employer is not liable for

failing to meet additional, unspoken needs absent some intervening circumstance sufficient to

trigger the interactive process unilaterally."). Venticinque has not presented any evidence of a cognitive disability or mental illness to excuse that he did not request an accommodation. Further, even taking a flexible approach to the assessment, no reasonable jury could find that the City's conduct was not in good faith or lacked reasonable efforts to help Venticinque determine what specific accommodations were necessary. The City referred Venticinque to a doctor for a medical examination of his injuries, which could have helped Venticinque identify any accommodations he needed to return to work. *See Beck*, 75 F.3d at 1136 (finding that a defendant did not act in bad faith or obstruct a plaintiff's efforts to acquire reasonable accommodations when the defendant requested that the plaintiff sign a release so that it could get more information on plaintiff's condition from a doctor).

Venticinque's assertion that he had a second phone call with Woods where he informed Woods that he could return to work, Woods prevented him from returning to work, and then Woods refused to speak with him further, does not support that the City obstructed Venticinque seeking a reasonable accommodation because, by stating he could return to work, Venticinque did not in any way indicate that he needed an accommodation and instead did the exact opposite.

Venticinque's assertion in his opposition to the City's motion for summary judgment that "[t]he City refused to send plaintiff the paperwork for an accommodation" also does not support that the City failed to provide him with a reasonable accommodation or failed to engage in the accommodation process. Doc. 86 at 8. Venticinque does not cite any evidence for this assertion, and so the Court cannot credit it. *See McCoy*, 2018 WL 4563076, at *3 ("[T]he Court does not consider an asserted fact that is not supported by admissible evidence, or an asserted fact that is not supported by the cited evidence.").

Ultimately, because Venticinque does not support his argument with adequate evidence that he engaged in protected activity by reporting his 2019 ear injury to his supervisors and that his supervisors failed to engage in an interactive accommodation process, no reasonable jury could find that Venticinque engaged in such protected activity. This leaves only Venticinque's 2011 IDHR charges and IHRC complaint as viable bases for his ADA retaliation claim, with his FMLA claim reserved without decision for the causation section below.

### B.    Adverse Employment Action

Venticinque argues he experienced the following adverse employment actions: (1) termination; (2) hostile treatment during his rehiring by the City; and (3) failure to pay him the backpay and award him the seniority that the IHRC awarded at the end of his ASO classroom training. The City concedes that Venticinque's termination of employment on June 25, 2019, qualifies as an adverse employment action. The City disputes that Venticinque suffered the other two adverse employment actions he alleges.

For retaliation purposes, an action is adverse if "a reasonable employee . . . would be dissuaded from engaging in the protected activity." *Koty v. DuPage Cnty.*, 900 F.3d 515, 520 (7th Cir. 2018) (quoting *Roney v. Ill. Dep't of Transp.*, 474 F.3d 455, 461 (7th Cir. 2007)). What qualifies as an adverse employment action is dependent on the circumstances of the case, but courts have found that "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [and] significantly diminished material responsibilities" are types of adverse employment actions. *Id.* (quoting *Barton v. Zimmer, Inc.*, 662 F.3d 448, 456 (7th Cir. 2011)).

Venticinque alleges that the City retaliated against him in several ways while he was rehired, including: (1) not informing him of the date he should report to work/training;

(2) unnecessarily and unreasonably delaying his intake, drug screening, and fingerprinting; (3) delaying and refusing to issue him his badge; (4) not issuing him his bullet-proof vest; and (5) delaying testing associated with him completing his training. A hostile work environment can be an adverse employment action, where the actions implementing the hostile work environment were "implemented 'in a way that subjects [the employee] to humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in his workplace environment.'" *Tarpley v. City Colls. of Chicago*, 752 F. App'x 336, 347 (7th Cir. 2018).

Taking the evidence in the light most favorable to Venticinque, Venticinque has presented sufficient evidence of a genuine issue of material fact as to whether the City created a hostile work environment for him during his rehiring. As discussed above, evidence exists on both sides of whether the City provided Venticinque with the start date for his training. The City emailed Venticinque's attorney the start date and Venticinque's sister, who sometimes communicated with the City on his behalf, emailed the City that Venticinque knew the start date was December 3. However, Venticinque's sister also testified that she and Venticinque did not know the start date and it appears that the City did not have Venticinque's address to send him the start date. Further, Venticinque testified that he did not receive a badge when he first went to receive one during his training, despite having the correct identification and that the City employee responsible for providing the badge instructed Venticinque to leave. Finally, Venticinque never received his bullet-proof vest. In combination, a reasonable jury could find that the way the City treated Venticinque amounted to an adverse employment action. *See Alamo v. Bliss*, 864 F.3d 541, 553 (7th Cir. 2017) (finding that several actions by an employer could amount to an adverse action where those actions could be construed as a tool to

marginalize, stigmatize, or delay the long-term career prospects of the employee); *Minge v. Cook Cnty.*, No. 20 C 6935, 2022 WL 4551899, at *6 (N.D. Ill. Sept. 29, 2022) (similar).

However, even if the Court assumes that failing to pay an employee backpay and seniority can qualify as an adverse employment action, the question still remains as to whether Venticinque has presented sufficient evidence to create an issue of material fact as to whether he completed his ASO training such that the IHRC order entitled him to backpay and seniority. Venticinque's IHRC award made the payment of backpay and instatement of seniority contingent on Venticinque "successfully complet[ing] his training." Doc. 78-5 at 84. The City and Venticinque's counsel jointly submitted a report to the IHRC on ASO qualifications and training, which stated that the "major components" of the "ASO Training Program" were six weeks of classroom training, three weeks of on-the-job training, and three weeks of training "on the Watch of assignment." Doc. 78-2 at 104. In his deposition testimony, Velasquez, the former CDA Managing Deputy Commissioner for Safety and Security testified that he believed training to be an ASO in 2017 or 2018 involved four to six weeks of training. Venticinque completed his classroom training on January 18, 2019. Venticinque then rotated through three weeks of on-the-job training on each watch from January 20 to February 9, 2019. Following those rotations, the City assigned to First Watch from February 10 to March 16, 2019. Venticinque did not return to work after February 14, 2019.

The parties dispute what training Venticinque needed to complete for purposes of the IHRC order. The City argues that Venticinque was still a probationary ASO who had not completed his training at the time of his termination. Specifically, the City claims that Venticinque needed to complete the full twelve weeks of the ASO Training program the parties described in the document they submitted to the IHRC. Further, the City argues that all new hire

ASOs were subject to a twelve month probationary period. Venticinque argues that the training for ASOs was four to six weeks, as described by Velasquez in his deposition, and that the probationary period for new ASOs was sixty days, meaning that he had completed his training and probationary period at the time the City terminated his employment.

The Court finds that no reasonable jury could conclude that Venticinque's training only involved the six weeks of classroom training that he completed in January 2019. Venticinque does not dispute that, just after the IHRC issued its ruling on Venticinque's claim and ordered that Venticinque receive backpay and seniority after he completed his training, Venticinque and the City jointly submitted a report on the requirements for ASO training that stated that training was twelve weeks. Venticinque also does not dispute that after he completed the classroom portion of the training, he engaged in the three-week rotation of on-the-job training, as described in the joint statement submitted to the IHRC and his own deposition. *See* Doc. 91-9 at 125, 127, 329 (describing his rotation schedule and assignments with ASOs on the job after his classroom training as "training"). The deposition testimony from Velasquez does not create an issue of fact as to the training requirements for Venticinque because he testified only generally and did not refute that the City and Venticinque agreed in the IHRC proceeding that Venticinque's training consisted of a twelve-week program.[16] *See, e.g.*, *Hooper v. Saint Rose Parish*, 205 F. Supp. 2d 926, 928–29 (N.D. Ill. 2002) ("[T]he question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.").

---

[16] The parties also dispute the length of Venticinque's probationary period. The City argues that Venticinque's probationary period was twelve months, whereas Venticinque argues that the probationary period was sixty days and his previous employment with CDA should have been credited towards that probationary period. At this time, the Court finds that this dispute is not material as there is no issue of material fact as to whether Venticinque completed his training, and the IHRC order made the payment of backpay and allocation of seniority contingent on Venticinque's completion of training, not his completion of the probationary period.

Ultimately, Venticinque has successfully established an issue of material fact as to whether he experienced the adverse employment actions of termination and negative treatment during rehiring, but he has not established that he was entitled to the backpay and seniority ordered by the IHRC so as to make his failure to receive those things an adverse employment action.

### C.    Causal Connection

Lastly, the Court assesses whether Venticinque's protected activity caused the adverse employment actions.  In this analysis the Court must "consider the evidence as a whole and ask whether a reasonable jury could draw an inference of retaliation."  *Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931, 936–37 (7th Cir. 2022) (quoting *King v. Ford Motor Co.*, 872 F.3d 833, 842 (7th Cir. 2017)).  "Circumstantial evidence of causation may include '(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive[d] better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action."  *Id.* at 937 (quoting *Rowlands v. United Parcel Serv.*, 901 F.3d 792, 802 (7th Cir. 2018)).

Venticinque argues he has shown a causal connection between the adverse actions and protected activity because: (1) several of the supervisors involved with his rehiring and second termination knew about his previous successful lawsuit against the City; (2) his success in his previous disability discrimination lawsuit against the City entitles him to an inference of improper motive in this case; (3) the timing of his second termination is suspect as it is just before he would have been entitled to seniority and backpay; (4) other recruits were treated differently; and (5) the City's reasons for his second termination were pretext.

Initially, the Court cannot credit Venticinque's argument that his success in his previous lawsuit against the City entitles him to an inference in this case that the City acted with an improper motive. To support his position, Venticinque cites to a First Circuit case, *LeBlanc v. Great American Insurance Co.*, 6 F.3d 836 (1st Cir. 1993). *LeBlanc* does not in any way stand for the proposition that if a defendant initially retaliated against a plaintiff, the plaintiff is entitled to an inference that the defendant retaliated with the same discriminatory motive later. *See id.* Rather, *LeBlanc* is an age discrimination case where the court found that the plaintiff could not show that the reasons for his termination were pretext. *Id.* at 845–49. And even setting aside Venticinque's incorrect citation of *LeBlanc*, the Court has not found any support for Venticinque's assertion that the City's previous retaliation against him entitles him to an inference of discriminatory retaliation in this case. Therefore, the Court does not consider this argument further when addressing causation. It now turns to the parties' other arguments concerning causation.

### 1.     Knowledge of Decisionmakers

Before the Court can reach the rest of its causation analysis, it must address the City's argument that key decisionmakers did not know of Venticinque's alleged protected activity, which would defeat his retaliation claims. "To establish a causal relationship between the protected activity and [an adverse action], a plaintiff must show that the decisionmaker was aware of the protected activity at the time the alleged retaliation occurred." *Noll v. Bd. of Regents of Univ. of Wis. Sys.*, No. 21-3176, 2022 WL 2113081, at *3 (7th Cir. June 13, 2022) (quoting *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111,124 (7th Cir. 2021)).

With respect to the FMLA application, even assuming that it qualifies as a protected activity under the ADA, Venticinque has not presented any evidence that any City supervisor

knew of Venticinque's FMLA application.  Thus, Venticinque's application for FMLA benefits cannot have caused any of the adverse employment actions of which he complains.  *Id.*

With regard to Venticinque's claims regarding a hostile work environment during rehiring, Venticinque has submitted sufficient evidence to create a genuine issue of material fact as to whether Velasquez, Everett, and Yanez knew about his previous case based on their emails.

Finally, the City argues that Rhee, the City employee who made the ultimate decision to terminate Venticinque did not know of his previous lawsuit against the City.  *See Roberts*, 998 F.3d at 124 (explaining that the relevant decisionmaker, the supervisor who made the adverse personnel decision, must be aware of the protected activity).  Venticinque argues that Rhee must have known about his successful previous lawsuit against the City because Rhee's subordinates knew about the lawsuit.  However, Venticinque has not presented sufficient evidence to create an issue of material fact as to Rhee's knowledge because the portions of Rhee's deposition to which Venticinque cites and the deposition as a whole do not support that Rhee had such knowledge.

But Venticinque also argues that even if Rhee did not have personal knowledge of his previous lawsuit against the City, that knowledge can be imputed to her under the "cat's paw theory."  A "cat's paw theory" permits the Court to impute the discriminatory or retaliatory animus of a different employee to the employee making an adverse employment decision where the person "nominally responsible for a decision is, by virtue of her role in the company, totally dependent on another employee to supply the information on which to base that decision."  *Hicks v. Forest Pres. Dist.*, 677 F.3d 781, 790 (7th Cir. 2012) (citation omitted).  Put another way, "the cat's paw theory requires both evidence that the biased subordinate actually harbored discriminatory animus against the victim of the subject employment action, and evidence that the biased subordinate's scheme was the proximate cause of the adverse employment action."

36

*Watkins v. City of Chicago*, No. 17 C 02028, 2020 WL 1469452, at *11 (N.D. Ill. Mar. 26, 2020) (quoting *Johnson v. Koppers, Inc.*, 726 F.3d 910, 914 (7th Cir. 2013)). Rhee testified that she relied on the memorandum prepared by Everett in reaching her decision to terminate Venticinque, and that she did not look at any evidence outside of that memorandum or have any reasons outside of those provided in the memorandum to terminate Venticinque. The City does not dispute Rhee's reliance on Everett's memorandum. Everett admitted in his deposition that he knew of Venticinque's lawsuit against the City and that Venticinque stood to receive backpay from the City if he completed his training. As discussed further below, some of the reasons provided in Everett's termination memorandum may be pretextual and support that Everett harbored retaliatory animus towards Venticinque. At this point, Venticinque has presented sufficient evidence to support a cat's paw theory as to knowledge for his claim that he was terminated in retaliation for his lawsuit against the City. *See Sinha v. Bradley Univ.*, 995 F.3d 568, 574 (7th Cir. 2021) (stating that one biased employee is the proximate cause of the ultimate decisionmaker's choice to institute an adverse employment action where the ultimately decisionmaker "relies on facts provided by the biased supervisor" and does not have reasons unrelated to the biased supervisor's actions) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 421 (2011)).

### 2. Causal Factors Regarding Venticinque's 2019 Termination

The Court turns next to Venticinque's arguments concerning the causal connection between his lawsuit against the City and his 2019 termination. Suspicious timing can be evidence that supports that there is a causal connection, but "alone rarely establishes causation." *Parker*, 39 F.4th at 937 (quoting *Sklyarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892, 898 (7th Cir. 2015)). Context is important to assessing whether suspicious timing warrants an

inference of causality, and significant intervening events can weigh against finding that suspicious timing supports causality. *See Davis v. Time Warner Cable*, 651 F.3d 664, 675 (7th Cir. 2011) (citation omitted). The timing of Venticinque's second termination does appear suspect as he was close to finishing his training, which would have entitled him to backpay and seniority. However, the City has also presented evidence of interceding events regarding his termination, such as Venticinque clocking out early, leaving his assigned post, and allegedly arguing with a recruit during training. But based on the available evidence, if the jury credited Venticinque's evidence more than the City's, it could reasonably find that the timing of Venticinque's termination is suspect enough to support causation.

Additionally, if a plaintiff can show that an employer's reasons for an adverse employment action were pretext, that supports the causation element of the plaintiff's ADA claim. *See Parker*, 39 F.4th at 937. Pretext exists where a plaintiff shows that the employer's stated reasons for the adverse employment action were a "lie" or identifies "such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's asserted reasons that a reasonable person could find it unworthy of credence." *Id.* at 938 (internal quotation marks omitted) (quoting *Ineichen v. Ameritech*, 410 F.3d 956, 961 (7th Cir. 2005); *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 721 (7th Cir. 2021)).

Venticinque argues that the City put him under intense scrutiny and attempted to "dirty up" his record to justify terminating him because they distrusted his integrity after his previous lawsuit against the City. Venticinque cites *Goode v. American Airlines, Inc.*, 741 F. Supp. 2d 877 (N.D. Ill. 2010), for the proposition that "if an employee can establish that the employer's professed reasons for beginning surveillance and terminating the employee are based on a distrust of his integrity with respect to his claims for workers' compensation, then the employee

38

may have a valid claim." Doc. 95 at 17–18. *Goode* does not stand for any such proposition. *Goode* involved a state law worker's compensation retaliation claim, and the court found that the defendant was entitled to summary judgment on the plaintiff's claim because the plaintiff could not show that the defendant's stated reason for terminating the plaintiff was pretext. *Id.* at 896. The *Goode* court observed that while "the issue of pretext is set aside for a moment, all of [the defendant's] professed reasons for beginning surveillance and terminating Plaintiff are based on a distrust of his integrity" but then went on to find that the plaintiff had not adequately shown a valid retaliation claim. *Goode*, 741 F. Supp. 2d at 894–96. This reasoning does not support that showing that an employer's distrust of an employee's integrity would establish pretext.

Venticinque contends that the numerous reasons the City provided for his termination were just an attempt to mask their discrimination and were pretext, namely that the City says that the termination was due to (1) Venticinque driving to pick up his injury paperwork from Woods despite telling Woods that he could not drive; (2) Venticinque fabricating his ear injury; (3) Venticinque getting into an argument with a fellow recruit; (4) Venticinque abandoning his post; and (5) Venticinque being absent from work without being granted leave.[17] *See Jackson v. Exec. Mgmt. Servs.*, 2024 WL 551861, at *6 (N.D. Ind. Feb. 12, 2024) ("To show pretext, [the plaintiff] must reveal that [the defendant]'s proposed reason for the adverse action—h[is] termination—is 'an attempt to mask a discriminatory reason with a legitimate excuse.'") (quoting *Brooks v. Avancez*, 39 F.3d 424, 434 (7th Cir. 2022)).

---

[17] Venticinque argues that the City has given differing reasons for his termination, however the evidence does not support that the City has been inconsistent. Rather, the termination memorandum that the City relied upon to terminate Venticinque contained each of these reasons and the City has relied on all of these reasons since then. This is not a circumstance where the City has offered shifting or inconsistent explanations for the adverse employment action, which is another way in which a plaintiff can show pretext. *See Parker*, 39 F.4th at 937–38.

There is an issue of material fact as to whether Venticinque lied to Woods about whether he could drive to the airport on the day he went to pick up his paperwork. Woods testified that Venticinque told him that he could not drive. Venticinque stated in his deposition that he did not tell Woods that he could not drive and that he believed Woods had a phone call with his father, mistaking Venticinque's father for Venticinque himself. It is unclear whether Venticinque's father told Woods that Venticinque could not drive. It is possible that a reasonable jury could find Venticinque's testimony more credible than Woods' testimony, and if so, that the jury could find that Woods knowingly lied about Venticinque telling him that he could not drive and that one of the City's stated reasons for terminating Venticinque was pretextual. *See Galvan v. Indiana*, 117 F.4th 935, 946 (7th Cir. 2024) ("[W]hen the basis for the termination is objectively unworthy of belief, a jury may infer pretext.").

There is no issue of material fact as to whether the City had a reasonable basis to believe Venticinque fabricated his ear injury. The Court does not need to determine whether in fact the AEDs injured Venticinque's ears, rather if the decisionmaker "honestly believed [their] reasons for taking the challenged actions, even if those reasons were incorrect, then the reasons were not pretextual." *See Brooks v. Avancez*, 39 F.4th at 435 (quoting *See v. Ill. Gaming Bd.*, 29 F.4th 363, 368 (7th Cir. 2022)). Dr. Lygizos, who evaluated Venticinque as part of his worker's compensation claim, found Venticinque to be "malingering," which meant that Venticinque "express[ed] a complaint that [did]n't match the objective evidence." Doc. 78-9 at 57. Venticinque testified that two other doctors evaluated him and found that he suffered from bilateral hearing loss. But he has not presented any reports from these doctors or any evidence that he provided the City with any documentation from these medical professionals to support the existence of his ear injury. Video recordings from the City appear to show Venticinque

talking with Rodriguez on the night he sustained his alleged hearing injury. And Rodriguez's statement supports that Venticinque never reported any injury to him on the night of his alleged injury. In combination, no reasonable jury could find that Rhee and other City employees who evaluated Venticinque's termination lacked an honest basis to believe that Venticinque fabricated his injury. *See Brooks*, 39 F.4th at 435–36 (finding that an employer had an honest belief that the employee had engaged in threatening behavior). However, this does not foreclose Venticinque's entire ADA retaliation claim, as the presence or absence of any particular category of evidence is not dispositive. *See Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 933 (7th Cir. 2020) ("'Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself' . . . the case must be assessed for an 'overall likelihood of discrimination.'" (citation omitted)).

Similarly, no issue of material fact exists as to whether the City had an honest belief that Venticinque got into an argument with another recruit during training. Venticinque himself wrote a report about what happened and titled it "Argument with recruit." Doc. 78-4 at 126. Venticinque confirmed in his deposition that his written statement was accurate, although he explained that his disagreement with the other recruit was not a heated exchange. No reasonable jury could find that the City did not have a reasonable basis to form the honest belief that Venticinque argued with a fellow recruit during training. *See Brooks*, 39 F.4th at 435–36 (explaining the evidence that supported that the employer had an honest belief that the employee made threats).

An issue of material fact does exist as to whether Venticinque acted improperly by leaving his post without permission and clocking out early on certain days, however. The City submitted timekeeping records and memorandums from employees documenting Venticinque

leaving work before the end of his shift and leaving his assigned posts. This evidence is sufficient to establish that the City had an honest basis to think Venticinque clocked out early on certain days and left his post without permission. However, Venticinque testified that he believed the City had a ten minute grace period for clocking out and that recruits regularly worked alone. A reasonable jury could credit Venticinque's testimony about the City's stated policy regarding work assignments to find that the City did not have the established policy such that clocking out less than ten minutes early or working alone was a valid basis for termination.

In further support of causation, Venticinque argues that the City deviated from its standard practices and policy, which dictated that he should be placed on "injured on duty" status, rather than be required to call in every day. In support of his argument, Venticinque cites to the "Duty Disability Leave" provision of the CBA in Section 15.8 and the CDA's May 10, 2010 Standard Operating Procedures document regarding leaves lasting more than four days. The City argues that ASOs were not entitled to "injured on duty" status under the CBA, and that Venticinque was calling in under "sick no pay" status because he had not begun to accrue paid sick leave under Section 15.4 of the CBA, and that termination was appropriate because probationary employees are not entitled to leave without pay under Section 17.2 of the CBA. Neither Venticinque nor the City fully respond to each other's arguments, the evidence, or point the Court towards any authority to support their interpretations of the evidence. The City does not provide any reason why the Standard Operating Procedures memorandum that Venticinque identifies does not cover Venticinque or why Venticinque was not entitled to "Duty Disability Leave" under Section 15.8 of the CBA. Rather, the City merely cites to deposition testimony from Woods, which supports that Venticinque was not placed on Duty Disability Leave, and argues that Section 15.8 of the CBA does not provide guidance for what to do when a "duty

42

disability benefit decision[]" was not made.  Doc. 107 at 7, 11.  Venticinque does not reconcile how the CBA could entitle him to "Duty Disability Leave" or a leave under the Standard Operating Procedures memorandum, but not entitle him to leave under the other provisions.  The Court will not make the parties' arguments for them or assemble the evidence to support their positions.  *See United States v. Dunkel*, 927, F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."); *Herman v. City of Chicago*, 870 F.2d 400, 404 (7th Cir. 1989) ("A district court need not scour the record to make the case of a party who does nothing.").  Based on the arguments and evidence presented by the parties, the Court finds that Venticinque has established an issue of material fact as to whether he qualified for Duty Disability Leave under the CBA and that the City failed to provide him with that leave.

Assessing Venticinque's arguments together, it appears that a reasonable jury could find that Venticinque's termination is causally related to Venticinque's protected activity of filing disability discrimination claims against the City.  The suspicious timing, that some of the City's reasons for terminating Venticinque may have been pretextual, and that the City did not place Venticinque on leave under the City policy are remaining issues of material fact that would permit a reasonable factfinder to conclude that Venticinque's protected activity caused the adverse action.  *See Fonseca v. Spraying Sys. Co.*, 466 F. Supp. 3d 834, 849–50 (N.D. Ill. 2020) (explaining that to show causation for an ADA causation claim is "whether the evidence as a whole 'would permit a reasonable factfinder to conclude' that Plaintiff's protected activities caused the adverse action" (quoting *Rowlands v. UPS*, 901 F.3d 792, 801 (7th Cir. 2018))).

### 3.     Causal Factors Regarding the Hostile Rehiring Process

Finally, the Court turns to whether sufficient evidence exists that would allow a reasonable jury to conclude that Venticinque's filing of disability discrimination claims against

the City caused the hostility he experienced during the rehiring process. The timing of the hostile experiences Venticinque alleges occurred during his re-hiring appear suspect as they occurred just after he had succeeded on his lawsuit against the City and before he was entitled to backpay and seniority. The City argues that some of its actions toward Venticinque during the rehiring process were justified, including because Venticinque did not bring proper identification to receive his ID card and the City could not easily communicate with Venticinque due to his lack of email address and phone number. However, Venticinque's testimony regarding what he brought with him to obtain his ID cards conflicts with the City's evidence, creating an issue of fact that is for the jury to resolve. Altogether, a reasonable jury could find that the timing of Venticinque's hostile treatment during rehiring was suspect and not justified by independent circumstances.

Venticinque argues that the December 2, 2018, emails between Yanez and Velasquez show that they were "hatch[ing]" a plan to ensure Venticinque did not finish training. But the evidence does not support an inference that Yanez and Velasquez created a plan to ensure Venticinque did not finish training. After Venticinque's sister emailed Yanez on December 2, 2018, at approximately 9:00 p.m., inquiring about Venticinque's start date, Yanez forwarded the email to City employees Easter, Everett, and Velasquez with the note "[p]er our discussion see below email" at approximately 10:00 p.m. on the same day. Doc. 91-4, at 132. One minute later, Velasquez emailed Yanez, asking her to call him. *Id.* In her deposition for this case, Yanez stated that she believes she called Velasquez after she received his email, but she does not recall anything about their discussion. Doc. 91-12, at 76–77. Velasquez stated that he could not remember if Yanez called him or what they would have spoken about. Doc. 91-4, at 168-69. This evidence supports an inference that Velasquez and Yanez had a phone call in which they

likely discussed Venticinque's start date, but Venticinque's argument that they agreed on a plan to prevent him from finishing training is pure speculation and not supported by the evidence. *See Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024) ("Speculation cannot create a genuine issue of fact that defeats summary judgment.").

Venticinque also argues that the City treated the other recruits differently during training. In his deposition, Venticinque testified that when he reported to the badging office, Medina recognized him from his previous time being employed by the City and subsequent lawsuit, and told Venticinque to get out of his office. A City employee also told Venticinque that he was not on the list for a bullet-proof vest when other trainees received them. Venticinque additionally stated that the City did not provide him with his new hire paperwork at the time it provided the paperwork to other new recruits, he believed he was assigned to driving more than other new recruits, and while the City denied his requests to work certain assignments, the City granted some of his fellow recruit's requests. The City argues that Venticinque's arguments that he was treated differently from other recruits are speculative and lack foundation.

The Court finds that at least some of Venticinque's assertions that the City treated him differently from other recruits are supported by sufficiently admissible evidence, such as Venticinque's testimony that Medina told him to get out of his office and that a City employee told him he was not on the list for a bullet-proof vest which are based on his direct personal experiences during training. Whether a jury decides to credit Venticinque's testimony remains a factual question not suited for resolution at summary judgment. Because the City has not presented evidence to refute Venticinque's testimony, and the Court must take the evidence in the light most favorable to Venticinque at this phase, Venticinque has created a question of material fact as to whether the City treated him differently than other recruits.

Altogether, Venticinque's evidence of suspicious timing and the City's treatment of Venticinque differently from other recruits creates issues of material fact such that a reasonable factfinder could conclude that Venticinque's hostile treatment during rehiring was causally related to his discrimination claims against the City. *See Fonseca,* 466 F. Supp. 3d at 849–50.

In sum, Venticinque has sufficiently established triable issues of fact as to whether he engaged in the protected activity of filing his IDHR charges and IHRC complaint; he experienced the adverse employment actions of termination and differential treatment from other recruits; and that the adverse actions were causally related to his protected activity. The Court, therefore, denies the City's motion for summary judgment on theses bases and enters judgment for the City on the remaining bases for Venticinque's ADA retaliation claim.

## II.     USERRA Discrimination and Retaliation

Next, the City moves for summary judgment on Venticinque's USERRA discrimination and retaliation claims. USERRA prohibits employment discrimination against members of the armed services, and the statute provides that an employer commits USERRA discrimination "where the employee's service membership was 'a motivating factor' in the employer's adverse action 'unless the employer can prove that the action would have been taken in the absence of such membership.'" *Arroyo v. Volvo Grp. N. Am., LLC,* 805 F.3d 278, 284 (7th Cir. 2015) (quoting 38 U.S.C. § 4311(c)(1)). Specifically, for a USERRA discrimination claim, there is a "two-step burden shifting scheme: (1) once a plaintiff makes out a *prima facie* case by showing that his membership was a 'motivating factor,' (2) the burden shifts to the employer to prove that it would have taken the same action regardless." *Id.* (quoting *Crews v. City of Mt. Vernon*, 567 F.3d 860, 864 (7th Cir. 2009)). To make out a USERRA retaliation claim, a plaintiff "must demonstrate that he engaged in activity protected under USERRA and that [the employer] took

an adverse employment action against him as a result." *Gross v. PPG Indus., Inc.*, 636 F.3d 884, 892 (7th Cir. 2011) (citation omitted). The same requirements for an adverse employment action that apply under other civil rights statutes apply under USERRA. *Id.*

Venticinque has presented sufficient evidence such that the Court denies the City's request for summary judgment on his USERRA discrimination and retaliation claims. As discussed above, it is not disputed that Venticinque engaged in protected activity by filing his IDHR charges and IHRC complaint against the City alleging discrimination on his veteran status or that he experienced an adverse employment action when the City terminated his employment in 2019. Further, Venticinque sufficiently established that he experienced an adverse employment action when the City engaged in several hostile actions during his rehiring. Additionally, as discussed above, taking the evidence in the light most favorable to Venticinque, Venticinque has presented sufficient circumstantial evidence such that a reasonable jury could find a causal relationship between the adverse actions and the protected activity in this case. *See Bello v. Vill. of Skokie*, 151 F. Supp. 3d 849, 864–65 (N.D. Ill. 2015) (holding that differential treatment between similar employees would be sufficient to permit a reasonable jury to find that the plaintiff's protected activity motivated the defendants' adverse employment action).

Venticinque's evidence similarly demonstrates that his veteran status may have been a "motivating factor" in his termination and hostile treatment during rehiring. Here, Venticinque previously filed a lawsuit against the City based on his veteran status and the City then proceeded to take actions that were hostile during Venticinque's rehiring, and the City terminated him shortly before he was eligible for his backpay and seniority under that lawsuit. A reasonable jury could find these actions showed animus toward Venticinque's military service and his rights flowing therefrom, and thus that his veteran status was a motivating factor for his

termination and hostile treatment during rehiring. *See Arroyo*, 805 F.3d at 285 (finding that where supervisors appeared to resent the burden that the plaintiff's military leave placed on the company and took actions based on that resentment, a plaintiff showed their military service was a motivating factor for those actions); *Mueller v. City of Joliet*, No. 17 C 7938, 2023 WL 6388246, at *6 (N.D. Ill. Sept. 26, 2023) (finding that where a plaintiff was treated differently than other employees in addition to other actions supported that military service was a motivating factor for the adverse action).

Further, the City has not adequately shown that it would have terminated Venticinque and treated him with hostility during rehiring regardless of his military service and discrimination lawsuit. As discussed above, unresolved questions of fact exist regarding some of the reasons the City provided for terminating Venticinque, including whether Venticinque lied to Woods about being able to drive, whether Venticinque acted improperly by leaving his post and clocking out less than ten minutes early on several occasions, and whether the City should have granted Venticinque leave for his alleged injury. It is unclear whether the City would have terminated Venticinque without these reasons, and the City therefore cannot meet its burden at this phase of showing that it would have terminated Venticinque regardless of any discriminatory motive. The Court thus denies the City's motion for summary judgment on the USERRA claims.[18]

---

[18] The City advanced two arguments concerning Venticinque's USERRA claims: (1) that Venticinque could not show any connection between his veteran status and either his 2010 or 2019 termination; and (2) that CDA would have terminated Venticinque regardless of his veteran status. As discussed above, Venticinque filed an IHRC complaint based on his veteran status regarding his 2010 termination, which the IHRC found to be substantiated, and then in 2019 when Venticinque was terminated again, a reasonable jury could find from the circumstantial evidence that the City terminated Venticinque to avoid paying him under the IHRC order, which was based in part on his veteran status. This Court has also found that some of the City's stated reasons for terminating Venticinque may have been pretext. The City has not presented any further legal argument or explored any differences between Venticinque's USERRA retaliation and discrimination claims. As it is not the Court's duty to construct the City's legal

### III.     IIED

Under Illinois law, to recover on an IIED claim, a plaintiff must prove: (1) the

defendant's conduct was extreme and outrageous, (2) the defendant intended that his conduct

inflict severe emotional distress or knew that there was a high probability that his conduct would

inflict such distress, and (3) the conduct in fact caused severe emotional distress.  *Bailey v. City*

*of Chicago*, 779 F.3d 689, 696 (7th Cir. 2015) (citing *Schiller v. Mitchell*, 357 Ill. App. 3d 435,

447 (2005)).  To assess whether a defendant's conduct was outrageous such that it goes "beyond

all bounds of decency and [is] considered intolerable in a civilized community," courts examine

the degree of power the defendant held over the plaintiff; whether the defendant knew the

plaintiff was particularly susceptible to emotional distress and acted inappropriately despite that

knowledge; and whether the defendant reasonably believed that his objective was legitimate.  *See*

*Cairel v. Alderden*, 821 F.3d 823, 835–36 (7th Cir. 2016) (describing Illinois law).

The City argues that the Illinois Worker's Compensation Act ("IWCA") precludes the

IIED claim, that the City's conduct was not extreme or outrageous, and that Venticinque's IIED

claim is time-barred pursuant to the Illinois Tort Immunity Act.  In response to the City's

arguments, Venticinque's entire response consisted of the following:

> Extreme and outrageous conduct.  They set Venticinque up to fail
> his training, [sic] They set him up to be injured and they
> discriminated against him for reporting an injury.  Finally they
> fired him because of his injury.  Plaintiff relies on all precious [sic]
> arguments as well as those raised in Plaintiff's response to
> Defendant's statement of facts.  Specifically, responses to SOF 11,
> 20, 23, 28, 51, 57-59; 61. [sic] 70, 74 and Plaintiff's statement of
> facts, specifically Nos. 24, 25, 31-33.  Defendant's arguments that
> IWCA precludes his IIED claim and IIED being time barred have
> already been raised and rejected by this Court.  Accordingly,

---

argument, the Court allows both the retaliation and discrimination claims to proceed at this time.  To the
extent that the Court has failed to comprehend the City's arguments concerning the USERRA
discrimination claim, the Court would consider an additional motion from the City at a later time.

> Plaintiff relies on his response to Defendant's motion to dismiss
> Doc. 19 and this Court's order. [sic] Doc. 28.

Doc. 95 at 19.

The City points out, correctly, that the court did not address whether the IWCA precludes

Venticinque's IIED claim at the motion to dismiss phase.  *See* Doc. 28 at 10–11.  Venticinque's

representation that the court made such a finding is inaccurate.  Because Venticinque failed to

provide this Court with reasons, either legal or factual, for why the IWCA does not preempt his

IIED claim, Venticinque waived his opposition on this issue and summary judgment for the City

is appropriate.  *See Mahran v. Advocate Christ Med. Ctr.*, 12 F.4th 708, 713 (7th Cir. 2021)

("[A] party opposing a summary judgment motion must inform the trial judge of the reasons,

legal and factual, why summary judgment should not be entered." (citation omitted)); *Arlin-Golf

v. Vill. of Arlington Heights*, 631 F.3d 818, 822 (7th Cir. 2011) ("But [the plaintiffs] cited no

relevant legal authority to the district court to support the proposition . . . . Thus, the argument is

waived."); *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) ("[P]erfunctory and undeveloped

arguments, and arguments that are unsupported by pertinent authority, are waived." (citation

omitted)).

Further, even if Venticinque did make any substantive argument that the IWCA did not

preclude his claim, that claim would likely fail based on the evidence presented.  Because of the

IWCA, "an employee may not bring a common law claim against her employer unless she

proves either that her injury was not accidental; that it did not arise from her employment; that it

was not received during the course of her employment; or that the injury is not compensable

under the IWCA." *Temores v. Cowen*, 289 F. Supp. 2d 996, 1007 (N.D. Ill. 2003) (citing

*Meerbrey v. Marshall Field & Co.*, 139 Ill. 2d 455, 463 (1990)); *Butler v. Ford Motor Co.*, No.

21 C 1244, 2022 WL 4448724, at *4 (N.D. Ill. Sept. 23, 2022) (similar).  Where, as in this case,

co-employees allegedly intentionally inflicted the employee's injury, courts consider the injury "accidental" and preempted under the IWCA unless the employee shows that the employer directed or expressly authorized the acts that caused the injury. *Temores*, 289 F. Supp. 2d at 1007. Even if the co-workers engaging in the injurious actions acted within the scope of their authority, that is not enough for the employee to show the employer directed or authorized the actions. *Id.* Venticinque has not shown that senior leadership authorized or directed CDA employees to treat Venticinque poorly or to set him up to injure his ears. Rather, Venticinque points to many different instances, involving different employees, alleging they were a set up for him to fail, injure himself, and lose his job. This allegation does not create an issue of material fact; it is unsupported speculation. *See Flowers*, 105 F.4th at 946 ("Speculation cannot create a genuine issue of fact the defeats summary judgment."). Therefore, the Court grants the City summary judgment on the IIED claim.

## CONCLUSION

For the reasons stated above, the Court grants in part and denies in part the City's motion for summary judgment [76]. The Court grants summary judgment for the City as to Venticinque's IIED claim and denies summary judgment as to Venticinque's ADA retaliation and USERRA claims premised on his 2019 termination and hostile treatment during rehiring stemming from his 2011 IDHR charges and IHRC complaint.

Dated: January 13, 2025

_____
SARA L. ELLIS
United States District Judge